Richard P. MAY

v.

**ROADWAY EXPRESS, INC.**

No. Civ.A. WMN–01–3243.

United States District Court,
D. Maryland.

Aug. 29, 2002.

Howard J. Needle, Baltimore, MD, for Plaintiff.

Joseph E. Santucci, Jr., Robyn B. Weiss, Morgan Lewis and Bockius LLP, Washington, DC, for Defendant.

## MEMORANDUM

NICKERSON, District Judge.

Before the Court is Defendant's motion for summary judgment. Paper No. 21. The motion has been fully briefed and is ripe for decision. Upon review of the pleadings and applicable case law, the Court finds that no hearing is necessary (Local Rule 105.6) and the motion will be granted.

## I. FACTUAL BACKGROUND

Plaintiff, Richard P. May, has been employed by Defendant Roadway Express, Inc. since October 8, 1984. His duties consist of driving a truck and making deliveries, primarily within the vicinity of Baltimore City. The work is physically demanding, requiring May to climb repeatedly in and out of his truck cab, hook and unhook his trailer, connect air hoses and electric lines, and load and unload freight. Roadway truck drivers can be assigned two basic types of routes, "volume runs," with one or two stops per day with a large amount of goods to be delivered at each stop, and "peddle runs," with 20 to 25 stops per day with a smaller amount of goods delivered at each stop.

Prior to the specific events that gave rise to the instant action, Plaintiff has reported injuries to his lower back on at least three occasions, in 1994, in 1995 and in 1997. These injuries each resulted in Plaintiff missing work for periods of from one to two months, during which he collected workers' compensation. According to Plaintiff, he suffered another job-related back injury on October 19, 2000. He did not report that injury to his employer, however, until October 27, 2000, when he called into his dispatcher to say that he would be unable to come to work.[1] Later that same day, he did come in to fill out an injury report.

Consistent with its standard procedure when an employee reports a job-related injury, Defendant sent Plaintiff to Roadway's doctor, Dr. Holloway, for an evaluation. Dr. Holloway determined that Plain-

---

1. In an affidavit submitted with his Opposition, Plaintiff stated that he called into his dispatcher on October 19, 2000 and told him about his injury. Plaintiff's Aff. at ¶ 5. In his deposition, however, Plaintiff stated that he did not remember if he told the dispatcher about the injury prior to October 27, 2000. Plaintiff's Dep. at 22.

tiff could return to modified duty within several days. Plaintiff also went to see his own personal physician, and Plaintiff's physician determined that Plaintiff was unable to return to work. Shortly after reporting his injury, Plaintiff filed a workers' compensation claim. Defendant opposed the claim, taking the position that the alleged injury was "personal" and not work-related.

On December 4, 2000, Plaintiff reported to work with a note from his doctor indicating that he was "fit for duty." The terminal manager, Paul Bernsten, informed Plaintiff that, before he would be allowed to return to work, he must take a return-to-work physical, which included a physical capacity test. According to the Complaint, the physical capacity test included a requirement that Plaintiff squat lift 70 pounds and curl 156 pounds. Although Plaintiff opines that the physical capacity test is "ridiculously and exceedingly unreasonably difficult," Opp. at 13, he does not deny that Defendant requires the test of all new hires and employees returning from personal injuries. Plaintiff was unable to pass the physical capacity test and alleges that he suffered further injuries to his back in the process of taking it. It is Defendant's insistence that Plaintiff take this test that forms the central core of this dispute.

On December 8, 2000, Plaintiff sent a letter to Bernsten recounting his difficulties in taking the test, and requesting, "[i]n the event you will not let me return to do work under conditions that I have been doing, and I am able to do, then, I would like the company to make any necessary reasonable accommodations to ensure that I am able to return to my driving duties since I am able to pass the required [Department of Transportation] physical." May Dep., Exh. 5. On December 19, 2000, Defendant responded to Plaintiff's letter stating that, while Road-

way did not consider Plaintiff to be disabled/handicapped, "Roadway is prepared to explore the topic of reasonable accommodation with you." May Dep., Exh. 7. In order to facilitate that exploration, Defendant invited Plaintiff to furnish Defendant information regarding his medical condition, as well as "[Plaintiff's] views ... describing [his] ideas about what [he is] seeking in the way of reasonable accommodation." *Id.* Despite Defendant's request, Plaintiff provided neither medical evidence nor suggestions as to what would constitute reasonable accommodations. He did provide several certifications from his physician that simply stated that Plaintiff was "not fit for duty." Those certifications were dated: December 13, 2000 (May Dep.Exh.6); January 4, 2001 (May Dep.Exh.8); February 1, 2001 (May Dep. Exh.9); February 21, 2001 (May Dep. Exh.10); and February 28, 2001 (May Dep.Exh.11).

On March 6, 2001, Plaintiff filed a charge with the Equal Employment Opportunity Commission [EEOC]. Complaint, Exh. 3. This charge centered on Defendant's refusal to allow him to return to work without first passing the physical capacity test, and he stated that he was "unaware of any other truck drivers who have been subjected to this physical test." *Id.* More specifically, he averred that, to his knowledge, "female drivers are not required to pass this exam." *Id.* In addition to his claim that he was being discriminated against on the basis of disability (his back impairment), the charge included claims of discrimination based on gender, age (49), and that Defendant retaliated against him because he complained about discrimination.

On March 30, 2001, the Maryland Workers' Compensation Commission [WCC] held a hearing on Plaintiff's claim for benefits arising out of the October 2000 injury,

as well as the re-injury that occurred during the December 2000 physical capacity test. After the hearing, but before the WCC issued its ruling, Plaintiff forwarded to Defendant a certification from his physician indicating that he was fit for "light duty." Defendant responded that there were no light duty assignments available for Plaintiff at the time, a fact that plaintiff does not dispute. Neither before this time, nor at this time, did Plaintiff offer or advance any accommodations that would enable him to perform his full duties.

On April 10, 2001, the WCC issued a decision in which it found that Plaintiff did not suffer a work-related injury on October 19, 2000. The WCC did find, however, that Plaintiff was suffering from a compensable injury from December 4, 2000 until February 21, 2001. After Plaintiff received this decision, he informed Defendant that he was "fit for duty" and that he was planning to return to work, full duty, on Monday, April 23, 2001. Plaintiff returned to work on that date and continues to work full time, without restriction.[2] Plaintiff alleges that, since returning to work, he has been subjected to harassment of various forms, including: being criticized for being too slow, being ridiculed by supervisors, being assigned less favorable delivery routes, and being denied overtime. Except for one occasion when he filed a grievance about the denial of overtime, Plaintiff never complained to anyone at Roadway about this alleged harassing treatment.[3]

The EEOC issued Plaintiff a right-to-sue letter on or about June 27, 2001. Plaintiff filed this action on October 31, 2001, alleging a violation of the Americans with Disabilities Act (ADA) (Count I), Retaliation (Count II), Age Discrimination

(Count III), violation of Title VII of the Civil Rights Act of 1964 (Title VII) (Count IV), Gross Negligence (Count V), Negligence (Count VI), and a violation of the Collective Bargaining Agreement (Count VII). Count VII was dismissed on a prior motion. See Memorandum and Order dated April 8, 2002. Defendant now moves for summary judgment as to all remaining claims.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Rule 56 mandates the entry of summary judgment against a party who, after reasonable time for discovery and upon motion, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial [and] [t]he moving party is 'entitled to judgment as a matter of law.' " *Id.* at 323, 106 S.Ct. 2548. (citations omitted).

If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505,

---

2. Because Plaintiff was now returning to work after an injury that the WCC determined to have been work related, he was not required to take the physical capacities test.

3. The single grievance was denied after an investigation disclosed that Plaintiff was offered the overtime, and declined it. *See* Def.'s Exh. 9.

91 L.Ed.2d 202 (1986) (citations omitted). Unsupported speculation is insufficient to defeat a motion for summary judgment. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411–12 (4th Cir.1986)). Moreover, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. Thus, only disputes over those facts that might affect the outcome of the case under the governing law are considered to be "material." *Id.*

Finally, in assessing such a motion, the Court must view the evidence and all justifiable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam).

With these principles in mind, the Court will address the arguments presented by the parties.

## III. DISCUSSION

### A. Americans with Disabilities Act Claims

To establish a prima facie case of discrimination under the ADA, a plaintiff must prove: "(1) that he has a disability; (2) that he is otherwise qualified for the benefit in question; and (3) that he was excluded from the benefit due to discrimination solely on the basis of the disability." *Baird v. Rose*, 192 F.3d 462, 466 (4th Cir.1999). In his opposition to the motion for summary judgment, Plaintiff identifies Defendant's denying him the opportunity to return to work on December 4, 2000 as the discriminatory action taken against him. Opp. at 12–20.

■ The Court will assume, for present purposes, that Plaintiff can demonstrate that he has a disability. He cannot, however, establish the remaining two elements of the prima facie case. Plaintiff cannot demonstrate that he was otherwise qualified to return to work during the relevant time period, as he submitted no less than five certificates from his physician declaring that he was "not fit for duty." Nor does Plaintiff offer evidence that Defendant denied him the opportunity to return to work on the basis of his disability. Although counter to the position taken in his EEOC charge, Plaintiff now acknowledges that Defendant uniformly requires all employees who suffered personal injuries to take and pass the physical capacities test before returning to work. May Dep. at 26–27 (stating that he "knows from his experience" that the lifting test is required of "anyone returning from personal injury or new hires"). The uncontested record indeed reveals that there were at least two non-disabled employees who were required to submit to the physical capacity test before being allowed to return to work. Declaration of Paul Bernsten at ¶ 21.

■ Plaintiff's "failure to accommodate" claim under the ADA is similarly without merit. To establish such a claim, the plaintiff must prove: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." *Rhoads v. Federal Deposit Ins.*, 257 F.3d 373, 387 n. 11 (4th Cir.2001). Implicit in that fourth element, is the requirement that the employee has, in good faith, engaged in an interactive process to identify, in cooperation with the employer, what would constitute a reasonable accommodation. *See Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir.1999) (noting that "the responsibility for fashioning a

reasonable accommodation is *shared* between the employee and the employer and courts have held that an employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer," emphasis in original).

In the instant action, Defendant sent a letter to Plaintiff indicating that it was "prepared to explore the topic of reasonable accommodation with [Plaintiff]" and asking him to describe his ideas about what he was seeking in the way of reasonable accommodation. May Dep., Exh. 7. Plaintiff failed to respond to that letter. In opposing the motion for summary judgment, Plaintiff attempts to excuse his failure to do so by arguing futility:

> Plaintiff's letter requesting a reasonable accommodation was met with what to the plaintiff ... was an astonishing response that Roadway did not consider him to be disabled. Plaintiff knew that he had suffered three serious work-related injuries to his back, that his back constantly hurt very badly, and that his daily activities had to be severely limited and modified as a result. He was flabbergasted to learn that his employer would question his disability under these severe circumstances. That letter was a complete put-off to the plaintiff.... He figured that he had no chance to prevail, and that such a futile confrontation would only be extremely upsetting.

Opp. at 21–22.

To excuse his failure to participate and cooperate in the interactive accommodations process on the ground of futility, a plaintiff must demonstrate that the employer "has essentially foreclosed the interactive process through its policies or explicit action." *Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir.1999). "[A]n employee's subjective belief about the futility of initiating the interactive process will not,

by itself, relieve him or her of that obligation." *Id.* While Plaintiff may have been "flabbergasted" that Defendant did not automatically accept his own determination that he was disabled without first obtaining some medical documentation, the Court finds nothing untoward in Defendant's straightforward request for additional information. Plaintiff's undisputed and complete failure to respond to that request is fatal to his failure to accommodate claim.

### B. Gender Discrimination Claim

██ To establish a gender discrimination claim under Title VII, Plaintiff must demonstrate that 1) he is a member of a protected class; 2) he suffered an adverse employment action; 3) he is qualified for his position; and 4) he was treated less favorably than female employees. *See Nichols v. Comcast Cablevision*, 84 F.Supp.2d 642, 653 (D.Md.2000). Plaintiff's gender discrimination claim is premised on his unsupported assertion that women are not required to take the same physical capacity test as he was. In moving for summary judgment, Defendant observes that there were no women employed as truck drivers at Plaintiff's terminal during the relevant time period. Plaintiff acknowledges this to be the case. May Dep. at 64.

In opposing the motion, however, Plaintiff urges the Court to expand its inquiry beyond Defendant's Baltimore terminal. Plaintiff contends that, "[u]nless Defendants can show that there are women drivers/dockworkers at other terminals who are required to take the same strength test ... plaintiff is entitled to the inference that female drivers/dockworkers are not required to pass that test." Opp. at 23. As Defendant observes, Plaintiff's argument displays a profound misunderstanding of his burden in defeating Defendant's motion. It is Plaintiff's burden to produce evidence that he was treated dif-

ferently than women (after taking discovery, if needed), and not Defendant's burden to prove that they were treated the same. Plaintiff has produced no evidence, whatsoever, to meet that burden.

### C. Age Discrimination Claim

Plaintiff concedes that he cannot establish a prima facie case of age discrimination. Opp. at 17. Accordingly, Defendant's motion will be granted as to this count.

### D. Harassment and Retaliation Claims

■■■ In support his harassment and retaliation claims, Plaintiff cites instances when his supervisors were critical of his job performance, and subjected him to "insults, smart alleck [sic] remarks, and ridicule." Opp. at 25. Plaintiff also alleges, in support of these claims, that he was given less desirable runs and denied overtime opportunities. The Court finds these allegations insufficient to support either claim.

As to Plaintiff's assertion that route assignments and overtime were distributed in a discriminatory or retaliatory manner, Plaintiff has not provided any evidence aside from his own subjective opinion. While he states in his deposition that, "*I feel* that with my back injury that I get a lot of the more physically demanding deliveries," and "*it appears to me* that I am given" runs that are more physically demanding, and "*I believe* ... I have been denied and not offered the overtime," May Dep. at 55–57, Plaintiff offers no evidence to support these beliefs.

As to the negative comments and criticisms, the Court finds that the nature of that criticism and ridicule simply does not rise to the level of severity that courts have deemed actionable. While courts have recognized that, like Title VII, the ADA creates a cause of action for hostile work environment harassment, *Fox v.*

*General Motors,* 247 F.3d 169, 176 (4th Cir.2001), courts have also similarly limited the cause of action to situations where the treatment of the plaintiff was "sufficiently severe or pervasive to alter a term, condition, or privilege of employment." *Id.* at 177. In making that determination, courts examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Of particular significance is the degree to which the conduct is related to the employee's disability. *See, Walton v. Mental Health Assoc.,* 168 F.3d 661 (3rd Cir.1999) (finding no claim for harassment where no evidence was presented that objectionable behavior was because of the plaintiff's disability). Furthermore, "the existence of a hostile environment cannot be predicated upon acts that are isolated or genuinely trivial." *Carter v. Ball,* 33 F.3d 450 (4th Cir.1994).

The same limitations on harassment claims are applicable to claims of retaliation. Courts have consistently recognized that " 'there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause.'" *Von Gunten v. Maryland,* 243 F.3d 858, 864 (4th Cir. 2001) (quoting *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998)). As with a claim of harassment, to be actionable, the conduct in question must adversely effect "the terms, conditions, or benefits" of the plaintiff's employment. *Von Gunten,* 243 F.3d at 865.

■■■ By Plaintiff's own admission, the ridicule and criticism under which he suffered was no different than that inflicted on all of his co-workers. Plaintiff concludes his affidavit with the following paragraph:

It is well known by the drivers at Roadway that they hardly ever get from Roadway whatever they ask for. If the managers at Roadway's Baltimore Terminal find out that a driver wants something that will make him happy, they will give him just the opposite. They will call the driver a cry-baby, ridicule him, and laugh in his face. That is how they also treated me, and this is why I was reluctant and hesitant to ask them for anything.

Plaintiff's Aff. at 8. While Plaintiff's characterization of Defendant's management approach, if accurate, would indicate that Defendant's Baltimore terminal was an unpleasant place to work for all of its employees, that characterization completely undercuts any inference of discrimination or retaliation. By Plaintiff's own description, his supervisors were equal opportunity tormentors.

### E. Negligence and Gross Negligence Claims

Plaintiff's negligence and gross negligence claims arise out of the injury he allegedly sustained while taking the physical capacities test. Plaintiff applied for, and received, workers' compensation benefits for that injury. Plaintiff's arguments to the contrary, notwithstanding, it is well established that worker's compensation law provides the exclusive remedy for an employee who is injured within the scope of his or her employment. *Johnson v. Mountaire Farms of Delmarva, Inc.*, 305 Md. 246, 253, 503 A.2d 708 (1986). In light of the award of workers' compensation benefits for this injury, the Court finds that summary judgment is appropriate as to Plaintiff's common law tort claims related to that same injury.

### IV. CONCLUSION

For the reasons stated above, the Court finds that Defendant is entitled to sum-mary judgment as to all claims. A separate order will issue.

### ORDER

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this day of August, 2002, by the United States District Court for the District of Maryland, ORDERED:

1. That Defendant's Motion for Summary Judgment, Paper No. 21, is hereby GRANTED, and that judgment is entered in favor of Defendant and against Plaintiff as to all claims;

2. That this action is hereby CLOSED;

3. That any and all prior rulings made by this Court disposing of any claims against any parties are incorporated by reference herein and this order shall be deemed to be a final judgment within the meaning of Fed.R.Civ.P. 58; and

4. That the Clerk of the Court shall mail or transmit copies of the foregoing Memorandum and this Order to all counsel of record.